## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: | **Jointly Administered** |
| EPIC Companies Midwest, LLC, | Case No. 24-30281 |
| EPIC Companies Midwest 2023, LLC, | Case No. 24-30282 |
| EPIC Employee, LLC, | Case No. 24-30283 |
| EOLA Capital, LLC, and | Case No. 24-30284 |
| EC West Fargo, LLC, | Case No. 24-30285 |
| Debtors.[1] | Chapter 11 Cases |

### DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION

> THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. CENTRAL TIME ON _____, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NORTH DAKOTA.

THIS DISCLOSURE STATEMENT, THE DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE DEBTORS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SOLICITATION BY THE DEBTORS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE ARTICLE VIII OF THE PLAN. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

---

[1] In accordance with Fed. R. Bankr. P. 2002(n) and 1005 and 11 U.S.C. § 342(c), as applicable, the Debtors' address is c/o Lighthouse Management Group, Inc., 900 Long Lake Road, Suite 180, New Brighton, MN 55112 and their Employer Identification Numbers (EINs) are as follows: 83-2840705 (EPIC Companies Midwest, LLC), 88-3709518 (EPIC Companies Midwest 2023, LLC), 88-4112082 (EPIC Employee, LLC), 88-0554720 (EOLA Capital, LLC) and 82-5331354 (EC West Fargo, LLC).

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS AND ALL EQUITY HOLDERS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MIGHT BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO THE PLAN OR OF THIS DISCLOSURE STATEMENT, NOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE SUCH OFFER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF SUCH SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE AND THE DEBTORS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN.   NO REPRESENTATIONS ARE AUTHORIZED BY THE COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS, THE VALUE OF THEIR ASSETS, OR THE VALUES OF ANY INTERESTS DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE

STATEMENT, OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE COURT.  HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING.  THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS.  ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING.  FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE.  AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO DETERMINATION OF CLAIMS AND DISTRIBUTIONS ON CLAIMS.  THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT.  ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, NOR CAN THE IMPACT OF ALL SUCH FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR

TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

# TABLE OF CONTENTS

I.      INTRODUCTION. ........................................................................................................ 1
    A.      Summary of the Plan. ........................................................................................ 1
    B.      Voting Procedures. ............................................................................................ 2
    C.      Brief Explanation of Chapter 11. ...................................................................... 2

II.     DESCRIPTION OF THE DEBTORS' BUSINESS AND OPERATIONS. ...................... 3
    A.      Nature and History of the Debtors. ................................................................... 3
    B.      Pre-Petition Debt Structure. .............................................................................. 4
    C.      Events Leading to the Chapter 11 Case. ........................................................... 5

III.    EVENTS DURING THE CHAPTER 11 CASE. ........................................................... 5
    A.      Bankruptcy Filing and First Day Orders. .......................................................... 5
    B.      Schedules and Statements. ................................................................................ 6
    C.      Retention and Employment of the Debtors' Professionals. ................................ 6
    D.      Adversary Proceedings. .................................................................................... 6
    E.      Payments and Settlements. .............................................................................. 11
    F.      Avoidance Actions and Other Litigation. ....................................................... 13

IV.     SUMMARY OF THE PLAN. ..................................................................................... 13
    A.      General Overview. .......................................................................................... 13
    B.      Classification of Claims and Interests. ........................................................... 14
    C.      Description of Classes and Treatment. ............................................................ 14
    D.      Distributions and Claims Administration. ....................................................... 16
    E.      Executory Contracts and Unexpired Leases. ................................................... 18
    F.      Conditions Precedent to Effective Date. ......................................................... 18
    G.      Effects of Confirmation. ................................................................................. 19

V.      MEANS OF EXECUTION. ........................................................................................ 22
    A.      Substantive Consolidation. ............................................................................. 22
    B.      Liquidating Trust and Liquidating Trustee. .................................................... 23
    C.      Liquidating Trust Advisory Committee. .......................................................... 26
    D.      Indemnification of Liquidating Trustee and Liquidating Trustee Advisory
        Committee. ..................................................................................................... 26
    E.      Term of Liquidating Trust. ............................................................................. 27
    F.      Dissolution of Committee. .............................................................................. 27

VI.     PROOFS OF CLAIM AND ADMINISTRATIVE CLAIMS. ...................................... 28

VII.    FEDERAL TAX CONSEQUENCES OF THE PLAN. ................................................ 28
    A.      Federal Income Tax Consequences to the Debtors. ......................................... 28
    B.      Federal Income Tax Consequences to Holders of General Unsecured
        Claims. ........................................................................................................... 29
    C.      Withholding and Reporting. ............................................................................ 29

VIII.   ALTERNATIVES TO THE PLAN. ............................................................................. 30
    A.      Chapter 7 Liquidation. .................................................................................... 30

B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ...................... 30
C.    Dismissal of the Chapter 11 Cases ........................................................................ 30

IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN ............................................. 31
A.    General Confirmation Requirements. ..................................................................... 31
B.    Best Interests Test. ................................................................................................. 31
C.    Financial Feasibility Test. ...................................................................................... 32
D.    Cramdown Alternative ............................................................................................ 32

X.    RISK FACTORS TO BE CONSIDERED ...................................................................... 33
A.    Bankruptcy Considerations. ................................................................................... 33
B.    No Duty to Update Disclosures. ............................................................................. 33
C.    Representations Outside this Disclosure Statement ............................................... 34
D.    No Admission. ........................................................................................................ 34
E.    Tax and Other Related Considerations. .................................................................. 34

XI.    RECOMMENDATION AND CONCLUSION ................................................................ 34

## I.   INTRODUCTION.

On July 8, 2024 (the "Petition Date"), EPIC Companies Midwest, LLC, EPIC Companies Midwest 2023, LLC, EPIC Employee, LLC, EOLA Capital, LLC, and EC West Fargo, LLC (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases (the "Chapter 11 Cases") are pending before the United States Bankruptcy Court for the District of North Dakota (the "Court"). Effective June 11, 2024, the Debtors appointed Lighthouse Management Group, Inc. as the Chief Restructuring Officer ("CRO") of the Debtors, which the Court subsequently approved on July 31, 2024. The Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") on July 30, 2024. The Debtors' Chapter 11 Plan of Liquidation (the "Plan") sets forth, among other things, the proposed treatment of claims in accordance with the Bankruptcy Code.

This Disclosure Statement is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and Disclosure Statement are not consistent, the terms of the Plan should control. Capitalized terms used, but not defined, in this Disclosure Statement shall have the same meanings in this Disclosure Statement as ascribed them in the Plan.

### A.   Summary of the Plan.

As of the effective date of the Plan (the "Effective Date"), the Debtors shall be substantively consolidated and all assets of the Debtors' bankruptcy estates shall transfer to a liquidating trust (the "Liquidating Trust") to be administered by the CRO, as the liquidating trustee (the "Liquidating Trustee"). The Liquidating Trustee will liquidate all remaining non-cash assets, undertake resolution of claims, pursue any viable avoidance actions and other causes of action, make distributions to holders of Allowed claims, and take any such other action as necessary to wind down the Debtors' businesses and distribute assets of the Liquidating Trust to holders of Allowed claims.

The Debtors propose the Plan to facilitate the most efficient and timely liquidation of the Debtors' remaining assets as well as the fastest distribution of proceeds to holders of Allowed claims. The Debtors believe that the Liquidating Trustee, and the committee appointed to oversee the Liquidating Trustee (the "Liquidating Trust Advisory Committee"), have the familiarity with the Debtors' assets and the liquidating expertise needed to realize the maximum value for the remaining assets in a reasonable period of time. The Debtors believe that the Plan will provide the greatest recovery for, and the fastest payment to, holders of Allowed claims.

As of March 31, 2025, the Debtors collectively hold approximately $282,535 in cash. The Debtors and/or Liquidating Trustee expect to, among other things: (a) litigate or settle all pending adversary proceedings, as more fully described below[2]; (b) evaluate and pursue any and all Causes

---

[2] The Debtors and Committee are unable to provide an estimated recovery on the pending adversary proceedings based on the current status of the adversary proceedings.

of Action[3]; and (c) liquidate any remaining assets.  The Debtors estimate that holders of Allowed general unsecured claims will receive between approximately 18.9% and 28.8% of the value of their Allowed claims.

**B.      Voting Procedures.**

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan.  If you hold claims in more than one class and you are entitled to vote claims in more than one class, you will receive separate ballots that must be used to vote in each separate class.  If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement.  Votes cast to accept or reject the Plan will be counted by class.  Please read the voting instructions on the ballot for a thorough explanation of the voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE DEBTORS' COUNSEL AT (612) 492-7730. THE DEBTORS AND COUNSEL FOR THE DEBTORS CANNOT PROVIDE YOU WITH ANY LEGAL ADVICE.**

To be counted, completed ballots must be mailed to Debtors' counsel at the following address:

> Attn: Shataia Stallings
> Fredrikson & Byron, P.A.
> 60 South Sixth Street, Suite 1500
> Minneapolis, MN 55402

**FACSIMILE, E-MAIL, OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

**C.      Brief Explanation of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a Chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of shareholders or members of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan

---

[3] The Debtors and Committee are also unable to provide an estimated recovery on the other Causes of Action at this time.

are sent to creditors, shareholders, and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under Section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has voted to accept the plan. Votes will be counted only with respect to claims: (a) that are listed on a debtor's bankruptcy schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the bankruptcy court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the bankruptcy court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under Section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if another impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim or interest must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

If a plan is confirmed by the Court, its terms are binding on the debtor, all creditors, and other parties in interest, regardless of whether they have voted to accept the plan.

## II.     DESCRIPTION OF THE DEBTORS' BUSINESS AND OPERATIONS.

### A.     Nature and History of the Debtors.

The Debtors are part of a series of affiliated companies known collectively as "EPIC Companies." EPIC Companies generally consist of the Debtors, certain real estate holding entities described below, certain service providing companies (i.e., property management and construction), and other companies involved in hospitality, restaurant, entertainment, and similar industries. All of them are affiliated with certain individuals who structured, organized, and sponsored this business activity, including Todd Berning.

3

EPIC Companies Midwest, LLC ("EPIC Midwest") was formed on or around November 19, 2018.  EPIC Midwest has one Class A member—EPIC Holdings, LLC ("Holdings I").  EC West Fargo, LLC ("EC") was formed on or around May 15, 2018.  EC has one Class A member—Holdings I.  EOLA Capital, LLC ("EOLA") was formed on or around February 8, 2022.  EOLA has two members—(a) Todd Berning; and (b) EPIC Holdings II, LLC ("Holdings II").  EPIC Companies Midwest 2023, LLC (EPIC Midwest 2023") was formed on or around August 15, 2022.  EPIC Midwest 2023 has two members—(a) Todd Berning; and (b) Holdings II.  EPIC Employee, LLC ("EPIC Employee") was formed on or around August 31, 2022.  EPIC Employee has two members—(a) Todd Berning; and (b) Holdings II.

Each of the Debtors was formed for the purpose of providing loans to various real estate development projects throughout the State of North Dakota, each of which was developed and managed by subsidiaries of EPIC Companies (the "Project Companies").  On information and belief, each of the Project Companies is a "single purpose entity," meaning that each holds one real estate development project.  Based on records reviewed to date, each of the Project Companies has a different ownership group.  Many of the Project Companies borrowed money from banks for the construction of the real estate projects at issue, and those banks generally hold senior secured positions on the real estate owned by each of the Project Companies.  In addition, certain of the Project Companies appear to have subordinated debt from lenders other than the Debtors.

The Debtors raised capital from various individuals and entities (collectively, "Investors").  The majority of the investments were structured and documented as loans from the Investors to the Debtors. Investors generally executed promissory notes, which in most cases provided for, among other normal loan terms, interest, monthly installment payments, and a balloon payment on the applicable maturity date (collectively, "Investor Notes"). On information and belief, the Investor Notes are unsecured.  Certain investments originating from self-directed IRAs appear to have been structured as equity contributions to the Debtors.  Such Investors executed Subscription Agreements and Letters of Investment Intent to acquire Class B membership units ("Class B Units"), but the applicable agreements also contain similarities to the Investor Notes, including the requirement of monthly payments.

On information and belief, both the Class B Units and the Investor Notes were intended to be issued pursuant to certain exemptions from the state or federal securities registration.  Specifically, all the Investors are intended to be "accredited investors" as defined by SEC Regulation D.  The Debtors stopped taking any new investments prior to the appointment of the CRO.

With the funds received from the Investors, the Debtors made loans to the Project Companies and certain other subsidiaries of EPIC Companies.  The majority of these loans require the Project Companies to make monthly installment payments to the Debtors and a final balloon payment on the applicable maturity date.  On information and belief, none of these loans is secured.

**B.    Pre-Petition Debt Structure.**

As of the Petition Date, EPIC Midwest allegedly owed approximately: (a) $15,893,620 in total Investor Notes; (b) $854,500 in Class B Units; and (c) $2,209,271 in loans to one or more of

the other Debtors.  As of the Petition Date, EC allegedly owed approximately: (a) $892,000 in total to Investor Notes; and (b) $40,000 in Class B Units.  As of the Petition Date, EOLA allegedly owed approximately $9,087,833 in total Investor Notes.  As of the Petition Date, EPIC Midwest 2023 allegedly owed approximately $11,764,738 in total Investor Notes.  As of the Petition Date, EPIC Employee owed approximately $485,613 in total Investor Notes.  On information and belief, none of the Debtors owe any obligations to any party holding a security interest in any of the Debtors' assets.

### C.    Events Leading to the Chapter 11 Case.

In the spring of 2024, EPIC Companies encountered several financial challenges.  Those challenges culminated in the public collapse of EPIC Companies' ongoing business, which was extensively reported in local and regional media.  That coverage tended to treat EPIC Companies as if all assets and liabilities were owned within a single structure.  As explained above, however, there is broad and diverse ownership of the various legal entities that collectively comprise the enterprise known as "EPIC Companies," which has prevented any one party seeking a single solution for all parties involved.

Instead, following the initial collapse, certain Project Companies began to take member action to sever ties with EPIC Companies to the extent possible and have elected new management to oversee operations and financial affairs. On information and belief, many Project Companies are now governed by various persons and/or groups and are not under uniform control.  Thereafter, certain of the Project Companies and other companies who owe money to the Debtors ceased making payments to the Debtors. Without the incoming payments, the Debtors lacked sufficient resources to make scheduled payments to Investors and Class B Unit holders, leaving Investors and Class B Unit holders unprotected in this complex situation.

The Debtors therefore decided to appoint the CRO to protect the Investors' and Class B Unit holders' investments and ensure equitable treatment of all parties in interest.  Both before and after the appointment of the CRO, certain Investors made demands of the Debtors and at least one Investor commenced a lawsuit.  In light of these events, the Debtors made the difficult decision to file these Chapter 11 Cases to maximize the value of their assets for the benefit of the Investors and Class B Unit holders and to ensure the fair and consistent treatment of all Investors and Class B Unit holders in each of the Debtors.

## III.    EVENTS DURING THE CHAPTER 11 CASE.

### A.    Bankruptcy Filing and First Day Orders.

The Debtors commenced their Chapter 11 Cases on the Petition Date by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.  The Debtors continued in possession of their assets and the management of their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

On July 16, 2024, the Court held an initial hearing to consider certain "first day" matters and entered orders that, among other things:

1.      Ordered the joint administration of the Debtors and instructed parties to file the majority of pleadings to the docket[4] for EPIC Midwest on an interim [Docket No. 31] and final basis [Docket No. 41];

2.      Authorized the Debtors to use cash collateral on an interim [Docket No. 32] and final basis [Docket No. 46].[5]

**B.      Schedules and Statements.**

On July 22, 2024, the Debtors filed their Schedules and Statement of Financial Affairs [Docket No. 37; EPIC Midwest 2023 Docket No. 24; EOLA Docket No. 24; EPIC Employee Docket No. 23; EC Docket No. 23].  On August 16, 2024, the Debtors filed certain amendments to their Schedules and Statement of Financial Affairs [Docket No. 78; EPIC Midwest 2023 Docket No. 34; EOLA Docket No. 32; EPIC Employee Docket No. 31; EC Docket No. 31].

**C.      Retention and Employment of the Debtors' Professionals.**

The Court approved the Debtors' retention of Fredrikson & Byron, P.A., as Chapter 11 counsel for the Debtors [Docket No. 49].  The Court also approved the Debtors' retention of the CRO, as the chief restructuring officer of the Debtors [Docket Nos. 59, 71].

**D.      Adversary Proceedings.**

As described more fully above, the Debtors' most significant assets are notes for funds loaned to the Project Companies.  On or shortly after the Petition Date, the majority of the Project Companies defaulted under their respective notes with the Debtors.  While the Debtors issued demands for payment on or around August 1, 2024, the majority of the Project Companies initially refused to repay the Debtors.  Consequently, the Debtors brought the following adversary proceedings against the Project Companies:

1.      *EPIC Companies Midwest, LLC and EOLA Capital, LLC v. Pioneer Place, LLC*, Adv. Case No. 24-07021.  EPIC Midwest and EOLA filed a complaint against Pioneer Place, LLC on November 1, 2024.  Pioneer Place, LLC failed to answer and, on December 31, 2024, the Court entered default judgments against Pioneer Place, LLC as follows: in favor of EPIC Midwest in the sum of $155,882.50 plus interest; and (b) in favor of EOLA in the sum of $32,201.50 plus interest.  The Debtors continue to work to collect

---

[4] Unless otherwise specified, all citations to the docket refer to the docket of EPIC Midwest.

[5] On October 8, 2024 [Docket No. 131], and on December 3, 2024 [Docket No. 180], the Court entered orders further authorizing the use of cash collateral [Docket No. 131].  Bank Forward was the only creditor asserting a security interest in the Debtors' cash collateral [Docket No. 39]. On November 7, 2024, counsel for Bank Forward notified the Debtors' counsel that Bank Forward's security interest terminated pursuant to the relevant loan documents.  Consequently, the Debtors did not require (and thus did not seek) authority for use of cash collateral after the Court's order granting use of cash collateral on December 3, 2024.

on the judgments, including seeking appointment of a receiver over the assets of Pioneer Place, LLC in Cass County – *EPIC Cos. Midwest, LLC v. Pioneer Place, LLC*, No. 09-2025-CV-00412.

2.      *EPIC Companies Midwest, LLC and EPIC Companies Midwest 2023, LLC v. Preference 42, LLC f/k/a EPIC Preference, LLC f/k/a Shepperd Equity Fund, LLC*, Adv. Case No. 24-07022.  EPIC Midwest and EPIC Midwest 2023 filed a complaint against Preference 42, LLC on November 1, 2024.  Preference 42, LLC filed an answer on December 18, 2024.  On January 15, 2025, the Court held a status conference and set August 13, 2025, as the trial ready date.  This adversary proceeding remains pending.

3.      *EPIC Companies Midwest, LLC, EPIC Companies Midwest 2023, LLC, and EPIC Employee, LLC v. Boulevard Square II, LLC, Boulevard Square III, LLC, and Boulevard Square IV, LLC*, Adv. Case No. 24-07023.  EPIC Midwest and EPIC Employee filed a complaint against Boulevard Square II, LLC, Boulevard Square III, LLC, and Boulevard Square IV, LLC on November 1, 2024.  Boulevard Square II, LLC and Boulevard Square IV, LLC failed to answer and, on January 10, 2025, the Court entered the following default judgments: (a) judgment in favor of EPIC Midwest against Boulevard Square II, LLC in the sum of $41,118.02 plus interest; (b) judgment in favor of EPIC Midwest 2023 against Boulevard Square IV, LLC in the sum of $231,337.50 plus interest; and (c) judgment in favor of EPIC Midwest 2023 against Boulevard Square IV, LLC in the sum of $31,040 plus interest.  The Debtors continue to work to collect on those judgments. Boulevard Square III, LLC filed an answer on December 18, 2024.  On January 15, 2025, the Court held a status conference and set August 13, 2025, as the trial ready date.  The adversary proceeding against Boulevard Square III, LLC remains pending.

4.      *EPIC Companies Midwest, LLC and EPIC Companies Midwest 2023, LLC v. SAD Downtown, LLC d/b/a The Firm*, Adv. Case No. 24-07024.  EPIC Midwest and EPIC Midwest 2023 filed a complaint against SAD Downtown, LLC on November 1, 2024.  SAD Downtown, LLC filed an answer on December 18, 2024.  On January 15, 2025, the Court held a status conference and set August 13, 2025, as the trial ready date. This adversary proceeding remains pending.

5.      *EPIC Companies Midwest, LLC, EPIC Companies Midwest 2023, LLC, EPIC Employee, LLC, and EOLA Capital, LLC v. Area 57 Association, Inc., Greenfield Commons, LLC, Greenfield Commons II, LLC, and Greenfield Commons III, LLC*, Adv. Case No. 24-07025.  EPIC Midwest, EPIC Midwest 2023, EPIC Employee, and EOLA filed a complaint against Area 57 Association, Inc. ("Area 57"), as well as Greenfield Commons, LLC, Greenfield Commons II, LLC, and Greenfield Commons III, LLC (collectively, the "Greenfield Defendants"), on November 1, 2024. Area 57 failed to answer and, on April 15, 2025, the Court entered a default judgment against Area 57 and in favor of EPIC Midwest in the sum of $25,140.84 plus interest. The Greenfield Defendants also failed to answer and, on March 13, 2025, the Debtors filed a motion for default judgments. The deadline for a response to the motion was April 3, 2025, but the Court order is pending. The Debtors continue to work to collect on the judgment against Area 57.

6.      *EPIC Companies Midwest, LLC and EPIC Companies Midwest 2023, LLC v. U of J MU Jamestown, LLC*, Adv. Case No. 24-07031. On November 22, 2024, EPIC Midwest and EPIC Midwest 2023 filed a complaint against U of J MU Jamestown, LLC ("Jamestown"). Prior to the answer deadline, the parties negotiated a resolution. On February 13, 2025, the Debtors filed a motion seeking to approve a settlement Jamestown, which required the payment of $65,000 to the Debtors. On March 11, 2025, the Court approved the settlement and the Debtors received payment of the $65,000. On March 14, 2025, EPIC Midwest and EPIC Midwest 2023 dismissed the adversary proceeding against Jamestown.

7.      *EPIC Companies Midwest 2023, LLC, EPIC Employee, LLC, and EOLA Capital, LLC v. Pioneer Place Holdings, LLC*, Adv. Case No. 24-07032. On November 22, 2024, EPIC Midwest 2023, EPIC Employee, and EOLA filed a complaint against Pioneer Place Holdings, LLC. Pioneer Place Holdings, LLC failed to answer and, on April 8, 2025, the Court entered default judgments against Pioneer Place Holdings, LLC as follows: (a) in favor of EPIC Midwest 2023 in the sum of $92,163 plus interest; (b) in favor of EPIC Employee in the sum of $51,287.50 plus interest; and (c) in favor of EOLA in the sum of $10,291.82 plus interest. The Debtors continue to work to collect on the judgments.

8.      *EPIC Companies Midwest 2023, LLC and EOLA v. LTC – The Don, LLC*, Adv. Case No. 24-07035. On December 13, 2024, EPIC Midwest 2023 and EOLA filed a complaint against LTC – The Don, LLC ("The Don"). On January 6, 2025, The Don filed its answer. The Court entered a scheduling order on January 16, 2025, setting August 13, 2025, as the trial ready date. On March 19, 2025, the parties negotiated an initial settlement agreement during a mediation. The Debtors expect to file a motion seeking approval of the settlement agreement shortly and will seek to dismiss this adversary proceeding after court approval of the settlement agreement.

9.      *EPIC Companies Midwest, LLC v. 36th and Veterans, LLC*, Adv. Case No. 24-07036. On December 13, 2024, EPIC Midwest filed its complaint against 36th and Veterans, LLC. 36th and Veterans, LLC initially failed to answer and, on January 22, 2025, EPIC Midwest filed a motion for default judgment. Prior to the objection deadline, 36th and Veterans, LLC filed its answer, on February 11, 2025. EPIC Midwest withdrew its motion for default judgment. The Court scheduled a trial date for August 12, 2025. This adversary proceeding remains pending.

10.     *EPIC Companies Midwest 2023, LLC and EOLA Capital, LLC v. EPIC Management, LLC*, Adv. Case No. 24-07037. On December 13, 2024, EPIC Midwest 2023 and EOLA filed their complaint against EPIC Management, LLC. EPIC Management, LLC failed to file an answer and, on February 28, 2025, the Court entered the following default judgments against EPIC Management, LLC as follows: (a) in favor of EPIC Midwest 2023 in the sum of $544,266.64 plus interest; and (b) in favor of EOLA and in the sum of $491,205 plus interest. The Debtors continue to work to collect on the judgments.

11.     *EPIC Companies Midwest, LLC and EPIC Companies Midwest 2023, LLC v. EPIC Holdings, LLC*, Adv. Case No. 24-07038. On December 13, 2024, EPIC Midwest and EPIC Midwest 2023 filed their complaint against EPIC Holdings, LLC. On January 22, 2025, EPIC Holdings, LLC filed its answer. The Court scheduled a trial date for August 27, 2025. This adversary proceeding remains pending.

12.     *EPIC Companies Midwest, LLC, EPIC Companies Midwest 2023, LLC, and EOLA Capital, LLC v. EPIC Holdings II, LLC*, Adv. Case No. 24-07039. On December 13, 2024, EPIC Midwest, EPIC Midwest 2023, and EOLA filed their complaint against EPIC Holdings II, LLC. On January 22, 2025, EPIC Holdings II, LLC filed its answer. The Court scheduled a trial date for August 27, 2025. This adversary proceeding remains pending.

13.     *EPIC Companies Midwest, LLC and EOLA Capital, LLC v. HI West Acres, LLC, f/k/a EPIC Hospitality, LLC*, Adv. Case No. 24-07040. On December 18, 2024, EPIC Midwest and EOLA filed their complaint against HI West Acres, LLC. On January 14, 2025, HI West Acres, LLC filed its answer. The Court entered a scheduling order on January 16, 2025, setting August 13, 2025, as the trial ready date. This adversary proceeding remains pending.

14.     *EPIC Companies Midwest, LLC, EPIC Companies Midwest 2023, LLC, and EOLA Capital, LLC v. LTC – The Lincoln, LLC*, Adv. Case No. 25-07005. On February 17, 2025, EPIC Midwest, EPIC Midwest 2023, and EOLA filed their complaint against LTC – The Lincoln, LLC. On March 20, 2025, LTC – The Lincoln, LLC filed its answer. A scheduling conference is set for May 20, 2025. This adversary proceeding remains pending.

15.     *EPIC Companies Midwest, LLC v. Fargo South Hospitality, LLC*, Adv. Case No. 25-07006. On February 20, 2025, EPIC Midwest filed its complaint against Fargo South Hospitality, LLC. Fargo South Hospitality, LLC filed its answer on March 24, 2025. Trial is expected in December 2025. This adversary proceeding remains pending.

16.     *EPIC Companies Midwest 2023, LLC and EOLA Capital, LLC v. Sheyenne 32 North, LLC, Sheyenne 32 South, LLC, and Sheyenne 32 South Residential, LLC*, Adv. Case No. 25-07007. On February 21, 2025, EPIC Midwest 2023 and EOLA filed their complaint against Sheyenne 32 North, LLC, Sheyenne 32 South, LLC, and Sheyenne 32 South Residential, LLC (collectively, the "Sheyenne Defendants"). The Sheyenne Defendants filed their answer on March 24, 2025. Trial is expected in December 2025. This adversary proceeding remains pending.

17.     *EPIC Companies Midwest 2023, LLC, EOLA Capital, LLC, and EC West Fargo, LLC v. EPIC Gateway LLC, EPIC Gateway North Real Estate Holdings, LLC, and Gateway Arches Real Estate Holdings, LLC f/k/a EPIC Gateway East Real Estate Holdings, LLC*, Adv. Case No. 25-07008. On February 21, 2025, EPIC Midwest 2023, EOLA, and EC West Fargo filed their complaint against EPIC Gateway LLC, EPIC Gateway North Real Estate Holdings, LLC, and Gateway Arches Real Estate Holdings,

LLC (the "Gateway Defendants"). On March 19, 2025, the Gateway Defendants filed their answer. Trial is expected in December 2025. This adversary proceeding remains pending.

18.     *EOLA Capital, LLC v. The Tracks – Maverick, LLC*, Adv. Case No. 25-07010. On March 4, 2025, EOLA filed its complaint against The Tracks – Maverick, LLC. The Tracks – Mavrick, LLC filed its answer on April 3, 2025. Trial is expected in December 2025. This adversary proceeding remains pending.

19.     *EPIC Companies Midwest, LLC, EPIC Companies Midwest 2023, LLC, EOLA Capital, LLC, and EC West Fargo, LLC v. EOLA Landholdings, LLC*, Adv. Case No. 25-07012. On March 10, 2025, EPIC Midwest, EPIC Midwest 2023, EOLA, and EC West Fargo filed their complaint against EOLA Landholdings, LLC. EOLA Landholdings, LLC failed to file an answer. On April 17, 2025, the Debtors filed a motion for default judgment, which remains pending.

20.     *EPIC Companies Midwest 2023, LLC v. Dutch Mill Development, LLC*, Adv. Case No. 25-07013. On March 10, 2025, EPIC Midwest 2023 filed its complaint against Dutch Mill Development, LLC. The answer is due on May 16, 2025. This adversary proceeding remains pending.

21.     *EPIC Companies Midwest, LLC v. CBE, LLC*, Adv. Case No. 25-07014. On March 10, 2025, EPIC Midwest filed its complaint against CBE, LLC. CBE, LLC failed to file an answer. On April 17, 2025, the Debtors filed a motion for default judgment, which remains pending.

22.     *EPIC Companies Midwest 2023, LLC and EOLA Capital, LLC v. Northern Mall Partners, LLC*, Adv. Case No. 25-07015. On March 10, 2025, EPIC Midwest 2023 and EOLA filed their complaint against Northern Mall Partners, LLC ("Northern Mall"). Prior to the answer deadline, the parties negotiated a resolution. On April 9, 2025, the Debtors filed a motion seeking Court approval of the settlement, which required the payment of $170,000 to the Debtors. The motion to approve the settlement remains pending.

23.     *EPIC Companies Midwest, LLC and EPIC Companies Midwest 2023, LLC v. Makt, LLC*, Adv. Case No. 25-07016. On March 10, 2025, EPIC Midwest and EPIC Midwest 2023 filed their complaint against Makt, LLC. Makt, LLC failed to file an answer. On April 17, 2025, the Debtors filed a motion for default judgment, which remains pending.

24.     *EPIC Companies Midwest, LLC v. EPIC Place, LLC*, Adv. Case No. 25-07017. On March 10, 2025, EPIC Midwest filed its complaint against EPIC Place, LLC. EPIC Place, LLC failed to file an answer. On April 17, 2025, the Debtors filed a motion for default judgment, which remains pending.

25.     *EPIC Companies Midwest 2023, LLC and EPIC Employee, LLC v. BA Downtown, LLC*, Adv. Case No. 25-07018. On March 10, 2025, EPIC Midwest 2023 and

EPIC Employee filed their complaint against BA Downtown, LLC.  BA Downtown, LLC failed to file an answer.  On April 17, 2025, the Debtors filed a motion for default judgment, which remains pending.

26.    *EPIC Companies Midwest 2023, LLC v. West Fargo Dive Bar, LLC*, Adv. Case No. 25-07019.  On March 10, 2025, EPIC Midwest 2023 filed its complaint against West Fargo Dive Bar, LLC.  West Fargo Dive Bar, LLC failed to file an answer.  On April 28, 2025, the Debtors filed a motion for default judgment, which remains pending.

### E.    Payments and Settlements.

During the pendency of the Chapter 11 Cases, certain of the Project Companies voluntarily repaid the amounts owed to the Debtors.  The Debtors also reached settlement agreements with a number of other Project Companies.  In total, the Debtors have recovered approximately $741,597 as of the date of this Disclosure Statement, and two settlement agreements collectively providing for $610,000 in settlement payments remain pending as of the date of this Disclosure Statement.  The following summarizes the payments and settlements received by the Debtors:

1.    Forward Building Investments LLC ("FBI") – prior to the Petition Date, the Debtors loaned FBI approximately $150,000.  After the filing of the Chapter 11 Cases, FBI repaid the Debtors the full balance of the outstanding loans, totaling $150,000.

2.    HIE Depot, LLC ("HIE") – prior to the Petition Date, the Debtors loaned HIE approximately $200,000.  In November 2024, HIE proposed paying the full $200,000 to the Debtors if the Debtors agreed to waive any unpaid interest, late fees, or collection costs.  The Debtors agreed to this proposal and the parties executed a settlement agreement, which was approved by the Court on December 19, 2024 [Docket No. 191].  The Debtors received the $200,000 from HEI.

3.    MBG Land, LLC ("MBG") – prior to the Petition Date, the Debtors loaned MBG approximately $25,000.  In November 2024, MBG proposed paying the full $25,000 to the Debtors if the Debtors agreed to waive any unpaid interest, late fees, or collection costs.  The Debtors agreed to this proposal and the parties executed a settlement agreement, which was approved by the Court on December 20, 2024 [Docket No. 199].  The Debtors received the $25,000 from MBG.

4.    8th & Main, LLC ("8th & Main") – prior to the Petition Date, the Debtors loaned 8th & Main approximately $10,000.  In November 2024, 8th & Main proposed paying $9,000 to the Debtors if the Debtors agreed to waive the remaining $1,000 and any unpaid interest, late fees, or collection costs.  The Debtors agreed to this proposal and the parties executed a settlement agreement, which was approved by the Court on December 20, 2024 [Docket No. 200].  The Debtors received the $9,000 from 8th & Main.

5.    Friends of the Wave, LLC ("Friends") – prior to the Petition Date, the Debtors loaned Friends approximately $31,050.  In November 2024, the Debtors learned that the only significant asset of Friends was an equity interest in The Wave Resort, LLC,

which was in the process of winding up its affairs and making a partial distribution to its equity holders. Friends proposed instructing the Wave to pay the Friends share of the equity distribution, in the amount of $29,000, directly to the Debtors in full satisfaction of the obligations owed by Friends to the Debtors. The Debtors agreed to this proposal and the parties executed a settlement agreement, which was approved by the Court on January 8, 2025 [Docket No. 204]. The Debtors received the $29,000 from Friends.

6.      LTC – The Falcon ("Falcon") – prior to the Petition Date, the Debtors loaned approximately $75,000 to Falcon. In December 2024, Falcon informed the Debtors that its only asset was approximately $13,597 in cash, which Falcon offered to pay to the Debtors in exchange for the Debtors waiving any additional amounts owed by Falcon to the Debtors. Based on Falcon's financial situation, the Debtors agreed to this proposal and the parties executed a settlement agreement, which was approved by the Court on February 20, 2025 [Docket No. 232]. The Debtors received the $13,597 from Falcon.

7.      Jamestown – prior to the Petition Date, the Debtors loaned approximately $65,000 to Jamestown. As described above, the Debtors initiated an adversary proceeding against Jamestown before negotiating a settlement that required Jamestown to pay $65,000 to the Debtors in exchange for the Debtors waiving interest, late fees, and collection costs. The Court approved this settlement agreement on March 11, 2025. [Docket No. 252]. The Debtors received the $65,000 from Jamestown.

8.      JP Place, LLC ("JP Place") – prior to the Petition Date, the Debtors loaned approximately $1,320,000 to JP Place. JP Place disputed the loan amount and argued that it had an inability to repay the full loan amount. The Debtors engaged in negotiations with JP Place and also conducted a financial analysis of JP Place. After conducting their analysis and through their negotiations with JP Place, the Debtors ultimately agreed to JP Place paying the Debtors $250,000 in exchange for the Debtors waiving the remaining outstanding balance and any interest, late fees, and collection costs. The Court approved this settlement agreement on April 8, 2025 [Docket No. 268]. The Debtors received the $250,000 on April 10, 2025.

9.      The Don – prior to the Petition Date, the Debtors loaned approximately $1,490,000 to The Don. The Don disputed the loan amount and argued that it had an inability to repay the full loan amount. The Debtors engaged in negotiations with The Don through a formal mediation process and the Debtors also conducted a financial analysis of The Don and its assets. After conducting their analysis and through the mediation process, the Debtors ultimately agreed to The Don paying the Debtors $440,000 in exchange for the Debtors waiving the remaining outstanding balance and any interest, late fees, and collection costs. The Debtors anticipate filing a motion to approve this settlement agreement in the near future.

10.     Northern Mall – prior to the Petition Date, the Debtors loaned approximately $190,000 to Northern Mall, with Northern Mall making a $20,000 principal payment prior to the Petition Date, leaving an outstanding principal balance of $170,000. As described above, the Debtors initiated an adversary proceeding against Northern Mall

12

before negotiating a settlement that required Northern Mall to pay $170,000 to the Debtors in exchange for the Debtors waiving interest, late fees, and collection costs. As of the date of this Disclosure Statement, the Court granted the motion to approve the settlement agreement and the Debtors anticipate Northern Mall making the settlement payment in the near future.

### F.    Avoidance Actions and Other Litigation.

Under Section 547 of the Bankruptcy Code, certain transfers made by the Debtors to creditors within 90 days (or, in some cases, one year) of the Petition Date may be recovered as preferential payments. Section 548 of the Bankruptcy Code gives the Debtors power to avoid fraudulent transfers. Such claims, and all Avoidance Claims, are transferred to the Liquidating Trust under the Plan. The Causes of Action include, but are not limited to, those items identified on Exhibit B to the Plan. No person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or Exhibit B to the Plan to any Cause of Action as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action. The Debtors expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine shall apply to a Cause of Action upon, after, or as a consequence of the Confirmation Order. All recoveries on any Causes of Action, including Avoidance Claims, shall be retained by the Liquidating Trust for use in making payments under the Plan.

## IV.    SUMMARY OF THE PLAN.

The below summary is provided for the convenience of holders of claims. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of claims are encouraged to review the full text of the Plan and to carefully read this entire Disclosure Statement, including all exhibits.

### A.    General Overview.

The purpose of the Plan is to create a mechanism for the liquidation of remaining property of the estates, the disposition of Causes of Action, the resolution of claim disputes, and the distributions to holders of Allowed claims in accordance with the priority scheme created by the Bankruptcy Code. The Debtors believe that the Liquidating Trust created under the Plan and the Liquidating Trustee and Liquidating Trust Advisory Committee will do this in a more cost-effective and timely manner than any other alternative, including the conversion of the case and the appointment of a Chapter 7 trustee. Specifically, the Debtors believe that, based on the Liquidating Trustee's and Liquidating Trust Advisory Committee's collective knowledge about the Debtors, the Liquidating Trustee will be able to liquidate the remaining estate assets and make a distribution quickly, preserving the present value of such distributions, and with lower administrative expenses. The Debtors therefore believe that holders of Allowed claims will realize a more favorable recovery of value than would occur under an alternative wind-down or liquidation.

**B.    Classification of Claims and Interests.**

As set forth in Article 5.1 of the Plan, the Plan provides for the substantive consolidation of the estates of the Debtors for the purposes of confirming and consummating the Plan, including, without limitation, voting, confirmation, and distributions.

The following table designates the classes of claims against and equity interests in the Debtors and specifies which of those classes are: (a) impaired or unimpaired by the Plan; and (b) entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code.  A claim is classified in a particular class only to the extent that the claim or interest qualifies within the description of that class and is classified in other classes to the extent that any remainder of the claim qualifies within the description of such other classes.

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Expenses | N/A | No |
| N/A | Statutory Fees and Court Costs | N/A | No |
| N/A | Priority Claims | N/A | No |
| 1 | General Unsecured Claims | Yes | Yes |
| 2 | Class B Equity Claims | Yes | Yes |
| 3 | Class A Equity Claims | Yes | No |

**C.    Description of Classes and Treatment.**

*1.    Unclassified Claims.*

i.    Allowed Administrative Expense Claims.

Except as otherwise provided in Article III of the Plan, holders of Allowed claims specified in Section 507(a)(2) of the Bankruptcy Code, shall: (a) be paid in full in cash from the Liquidating Trust as soon as reasonably practical following the later of: (i) the Effective Date; (ii) the due date; or (iii) the date the claim becomes Allowed; or (b) receive such other treatment as agreed in writing by the holder thereof or ordered by the Court.

With respect to the Debtors' Allowed operating expenses incurred during the Chapter 11 Cases, the Debtors generally paid these expenses as they came due or through other arrangements thereafter.  If any Allowed Administrative Expense Claims resulting from postpetition operations come due after the Effective Date, or for any other reason have not been paid as of the Effective Date, these claims shall be paid from the Liquidating Trust as the claims become due or as otherwise agreed between the holders of such claims and the Liquidating Trustee.

Professional fees and expenses incurred through the Effective Date and not previously Allowed shall be subject to Court approval after the Effective Date. All holders of professional fees and expenses claims shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than

14

30 days after the Effective Date.  The Liquidating Trustee shall pay any Allowed professional fees and expenses within 10 days of the later of: (a) the Effective Date; or (b) the Court's order allowing such claim.

In the event that the Debtors have liability to any taxing authority on account of unpaid taxes that accrued and were payable after the Petition Date, the Debtors or the Liquidating Trustee shall pay such taxes from the Liquidating Trust in full in cash as soon as practicable following the later of: (a) the Effective Date; or (b) approval by the Court.

ii.    Statutory Fees and Court Costs.

Court costs and fees payable by the Debtors under 28 U.S.C. § 1930 shall be paid in full in cash from the Liquidating Trust on the Effective Date or as soon as practicable thereafter or as required under the U.S. Trustee's quarterly fee payment guidelines.  The Debtors estimate these claims shall be nominal, as they have remained current on such payments.  After the Effective Date, the Liquidating Trustee shall be responsible for paying quarterly fees to the U.S. Trustee, filing monthly operating reports through the substantial consummation of the Plan on the Effective Date, and, thereafter, filing quarterly reports through the date the Chapter 11 Cases are closed, dismissed, or converted.  Such reports shall be in the format prescribed by the U.S. Trustee. This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

iii.    Unsecured Priority Claims.

The Debtors estimate that the Allowed Priority Tax Claims total approximately $0.  The Allowed Priority Tax Claims shall be paid in full in cash as soon as practicable following the later of (a) the Effective Date; or (b) the date on which such claims are Allowed.

Notwithstanding anything to the contrary in the Plan, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with, the Allowed Priority Tax Claim.  Any such claim or demand for any such penalty shall be subject to treatment in Class 1, if not subordinated to Class 1 claims pursuant to an order of the Court.  The holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors, the Liquidating Trust, or the property of either (other than as a holder of a Class 1 claim).

All other Allowed claims not specifically treated in Article III of the Plan and entitled to priority under Section 507(a) of the Bankruptcy Code shall be paid from the Liquidating Trust in full in cash as soon as practicable following the later of: (a) the Effective Date; (b) the due date; or (c) the date on which such claims are Allowed.

2.    *Class 1 – General Unsecured Claims.*

Class 1 consists of the general unsecured claims asserted against the Debtors.  Except to the extent that a holder of a Class 1 claim: (a) has been paid by the Debtors prior to the Effective Date; or (b) agrees to a less favorable classification and treatment, each holder of an Allowed Class

1 claim shall receive a pro rata distribution from the Liquidating Trust after the payment of all Administrative Expense Claims as provided in Article 3.1 of the Plan, statutory fees and costs as provided in Article 3.2 of the Plan, Allowed priority claims as provided in Article 3.3 of the Plan, and all costs and expenses of the Liquidating Trust. Class 1 claims shall include claims by counterparties to executory contracts and unexpired leases that are rejected pursuant to Article VII of the Plan.

Nothing contained in the Plan shall restrict the Debtors or the Liquidating Trustee from objecting to, contesting, or seeking to avoid a Class 1 claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1 claims pursuant to Article IV of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Class 1 claims.

3. *Class 2 – Class B Equity Claims.*

Class 2 consists of the Class B Equity Interests. Except to the extent that a holder of a Class 2 claim: (a) has been paid by the Debtors prior to the Effective Date; or (b) agrees to a less favorable classification and treatment, each holder of an Allowed Class 2 claim shall receive the same treatment as provided to the holder of an Allowed Class 1 claim under Article 4.1 of the Plan.

Nothing contained in the Plan shall restrict the Debtors or the Liquidating Trustee from objecting to, contesting, or seeking to avoid a Class 2 claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 2 claims pursuant to Article IV of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Class 2 claims.

4. *Class 3 – Class A Equity Claims.*

Class 3 consists of the Class A Equity Interests in the Debtors. Holders of Class 3 claims shall not receive a distribution under the Plan. All Class A Equity Interests shall be deemed cancelled upon the Effective Date. Class 3 is deemed to reject the Plan

**D. Distributions and Claims Administration.**

Unless otherwise provided in the Plan, the Liquidating Trustee shall make a final distribution after determining, in consultation with the Liquidating Trust Advisory Committee, that all assets that feasibly could be liquidated have been liquidated. At its discretion, but in consultation with the Liquidating Trust Advisory Committee, the Liquidating Trustee may make, but is not required to make, an initial distribution and additional distributions before the final distribution

Payments under the Plan shall be made by ACH or check, mailed with first class postage pre-paid, to the holder of each Allowed claim at the address listed on its proof of claim as of the Confirmation Date, or if no proof of claim has been filed by the Confirmation Date, to the address listed on the Schedules. Holders of Allowed claims may contact the Liquidating Trustee to amend their addresses as follows:

16

Renee Foss
Lighthouse Management Group Inc.
900 Long Lake Road, Suite 180
New Brighton, MN 55112
(651) 439-5119

Unless a claim is specifically Allowed under the Plan, or otherwise Allowed prior to or after the Effective Date, the Liquidating Trustee shall have and retain any and all objections to any and all claims, motions, or other requests for the payment of claims, whether administrative expense, secured, or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, liens, and security interests, whether under the Bankruptcy Code, other applicable law, or contract.

Unless otherwise ordered by the Court in the Confirmation Order, any objections to claims, except objections to Administrative Expense Claims or objections arising under Section 502(d) of the Bankruptcy Code, shall be filed within 120 days after the Effective Date (unless such date is not a business day, in which case such deadline shall be the next business day thereafter) or at such later date as approved by the Court upon request from the Liquidating Trustee. Any claim objections arising solely under Section 502(d) of the Bankruptcy Code shall not be subject to the 120-day deadline and may be pursued through an adversary proceeding asserting an Avoidance Claim.

Except as otherwise agreed by the Liquidating Trustee, any claim as to which a proof of claim, motion, or other request for payment was timely filed in the Chapter 11 Cases may be determined and liquidated pursuant to: (a) a Final Order of the Court; or (b) a Final Order under applicable non-bankruptcy law, and shall be deemed Allowed in such liquidated amount and satisfied in accordance with the Plan. Nothing contained in the Plan, this Disclosure Statement, or the Confirmation Order shall constitute or be deemed a waiver of any claim, right, interest, or Cause of Action that the estates, the Liquidating Trustee, or the Liquidating Trust may have against any person in connection with, or arising out of, any claim or claims, including, without limitation, any rights under 28 U.S.C. § 157(b).

Notwithstanding any other provision in the Plan, no payments or distributions shall be made with respect to all or any portion of a Contested Claim unless and until all objections to such Contested Claim have been settled or withdrawn or have been determined by a Final Order, and the Contested Claim has become an Allowed claim.

The Debtors or the Liquidating Trustee may request estimation or limitation of any Contested Claim that is contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code; provided, however, that the Court shall determine: (a) whether such Contested Claim is subject to estimation pursuant to Section 502(c) of the Bankruptcy Code; and (b) the timing and procedures for such estimation proceedings, if any. Unless provided otherwise in an order of the Court, the estimated amount shall constitute the Allowed amount of such claim or a maximum limitation on such claim, as the Court may direct; provided, however, that if the estimate constitutes the maximum limitation on such claim, the Debtors or the Liquidating Trustee may

17

elect to pursue supplemental proceedings to object to the ultimate allowance of such claim. The foregoing shall not limit the rights granted by Section 502(j) of the Bankruptcy Code.

The Liquidating Trustee may, pursuant to applicable non-bankruptcy law, set off against any distribution to be made pursuant to the Plan, the claims, rights, and Causes of Action of any nature the Debtors or the Liquidating Trustee may hold against the holder of such Allowed claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any claim hereunder shall constitute a waiver or release of any such claims, rights, and Causes of Action that the Debtors or the Liquidating Trustee may hold against such holder.

### E. Executory Contracts and Unexpired Leases.

Each contract, lease, or other agreement listed on Exhibit C to the Plan shall be assumed as of the Effective Date, to the extent that each such contract, lease, or other agreement has not already expired, concluded, or terminated under its own terms. All other executory contracts, unexpired leases, or other agreements that are not listed on Exhibit C and were not previously assumed or rejected by Final Order of the Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to Sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all such executory contracts and unexpired leases.

The Debtors have identified the cure amounts that they believe exist for the contracts, leases, or other agreements listed on Exhibit C. Payments of any cure amounts shall be made by the Liquidating Trust as provided in Article 4.1 of the Plan. The Liquidating Trustee shall retain all rights to contest any cure amount claims asserted by any entity.

To the extent not subject to a claims bar date set forth in any prior or subsequent order of the Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to Article 7.1 of the Plan must be filed with the Court no later than 30 days after the entry of the Confirmation Order and, upon allowance, shall be an Allowed Class 1 claim. Any claims not filed within such applicable time periods shall be forever barred from receiving a distribution from the Debtors, the estates, or the Liquidating Trust.

### F. Conditions Precedent to Effective Date.

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Article 8.2 of the Plan:

1. The Court shall have entered the Confirmation Order, the Confirmation Order shall be a Final Order, and no stay of the Confirmation Order shall be in effect.

2. The appointment of the Liquidating Trustee shall have been confirmed by order of the Court.

3. All agreements and instruments that are exhibits to the Plan shall be in a form reasonably acceptable to the Debtors, and have been duly executed and delivered,

including without limitation, the Trust Agreement; provided, however, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

4.      The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Article 12.1 of the Plan.

Notwithstanding the foregoing conditions in Article VIII of the Plan, the Debtors reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date or Confirmation Date, as applicable, shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## G.      Effects of Confirmation.

### 1.      *Title to and Vesting of Assets.*

All property of the Debtors and the estates is dealt with by the Plan; therefore, on the Effective Date, to the full extent allowed by Section 1141(b) of the Bankruptcy Code, all property of the Debtors and the estates vests in the Liquidating Trust and such property is free and clear of all liens, encumbrances, claims, and interests of creditors and equity security holders, except to the extent the Plan explicitly provides that such liens, encumbrances, claims, or interests are retained. From and after the Effective Date, the Liquidating Trust may operate, use, acquire, and dispose of property in accordance with the Plan, free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

### 2.      *Preservation of Causes of Action.*

Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors and the bankruptcy estates may hold against any entity shall automatically be transferred to and vest in the Liquidating Trust on the Effective Date, including, without limitation, any and all Causes of Action asserted in any pending adversary proceedings commenced by the Debtors prior to the Effective Date.  Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action that were held by the Debtors and the bankruptcy estates, in its sole discretion and without further order of the Court, in any court or other tribunal, including, without limitation, in any adversary proceeding filed in one or more of the Chapter 11 Cases.

Unless a Cause of Action against an entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order of the Court, including, without limitation, the Confirmation Order, the Debtors and their bankruptcy estates expressly reserve such Causes

of Action for later adjudication or administration by the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order, including, without limitation, the Confirmation Order.  In addition, the Debtors and their bankruptcy estates expressly reserve the right of the Liquidating Trustee to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any entity to whom the Debtors may have incurred an obligation (whether on account of services, purchase or sale of goods, or otherwise), or whom has received services from the Debtors or a transfer of money or property of the Debtors, or whom has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (a) such entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (b) the Debtors have objected to any such entity's proof of claim; (c) any such entity's claim was included in the Schedules; (d) the Debtors have objected to any such entity's scheduled claim; or (e) any such entity's scheduled claim has been identified by the Debtors as disputed, contingent, or unliquidated.

3.    *Injunction.*

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their bankruptcy estates, the Liquidating Trust, the Liquidating Trustee, the Committee, their successors and assigns, and their assets and properties, as the case may be, any suit, action, or other proceeding, on account of or respecting any claim or equity interest, demand, liability, obligation, debt, right, cause of action, interest, or remedy released or satisfied or to be released or satisfied pursuant to the Plan or Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all entities shall be precluded from asserting against the Debtors, their bankruptcy estates, the Liquidating Trust, the Liquidating Trustee, the Committee, their successors and assigns, and their assets and properties, any other claims or equity interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that: (a) such claims or equity interests have been released or satisfied pursuant to the Plan or the Confirmation Order; or (b) such claims, equity interests, actions, or assertions of liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.

The rights afforded in the Plan and the treatment of all claims and equity interests in the Plan shall be in exchange for and in complete satisfaction of claims and equity interests against the Debtors or any of their assets or properties solely to the extent that: (a) such claims or equity interests have been released or satisfied pursuant to the Plan or Confirmation Order; or (b) such claims, equity interests, actions, or assertions of liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.  On the Effective Date, all such claims against, and equity interests in, the Debtors shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all persons and entities are permanently enjoined, on and after the Effective Date, on account of any claim or equity interest satisfied and released pursuant to the Plan or Confirmation Order from: (a) commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, any of the bankruptcy estates, the Liquidating Trust, the Liquidating Trustee, the Committee, their successors and assigns, and their assets and properties; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Debtor, any of the bankruptcy estates, the Liquidating Trust, the Liquidating Trustee, the Committee, their successors and assigns, and their assets and properties; (c) creating, perfecting, or enforcing any encumbrance of any kind against any Debtor, any of the bankruptcy estates, the Liquidating Trust, the Liquidating Trustee, the Committee, their successors and assigns, and their assets and properties; (d) commencing or continuing in any manner any action or other proceeding of any kind in respect of any claim or equity interest or Cause of Action released or settled under the Plan.

### 4.     *Releases by the Debtors and Their Estates.*

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, each of the Debtors, their estates, and their current and former representatives shall be deemed to have provided a full, complete, unconditional, and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtors, their estates, their current and former representatives, and the Committee and its members but solely in their capacity as members of the Committee and not in their individual capacities), from any and all causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date, or airing thereafter, in law, at equity, whether for tort, contract, violations of statutes (including, without limitation, the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to, or on, the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any holder of a claim or equity interest or other entity would have been legally entitled to assert for, or on behalf of, any of the Debtors or the estates, including those in any way related to the Chapter 11 Cases or the Plan; <u>provided</u>, <u>however</u>, that the foregoing release shall not prohibit the Debtors or the Liquidating Trustee from asserting any and all affirmative claims, defenses, and counterclaims in respect to any contested claim asserted by any Released Party.**

21

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Article 8.6 pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the claims and causes of action released by the Plan; (b) in the best interests of the Debtors and all holders of claims and equity interests; (c) fair, equitable, and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any claim or cause of action thereby released

5.      **Exculpation.**

Notwithstanding anything contained in the Plan to the contrary, the Released Parties shall neither have nor incur any liability relating to these Chapter 11 Cases to any entity for any and all claims and causes of action arising after the Petition Date and through the Effective Date, including, without limitation, any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or consummating the Plan or distributing property under the Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, including, without limitation the execution of any and all settlement agreements filed with the Court in the Chapter 11 Cases; underlined provided, underlined however, that the foregoing provisions of shall have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

V.      **MEANS OF EXECUTION.**

A.      **Substantive Consolidation.**

The Plan and Disclosure Statement jointly incorporate the Debtors' *Motion for Substantive Consolidation of the Debtors' Assets, Liabilities, and Operations* [Docket No. __]. The Plan contemplates and is predicated upon the Confirmation Order substantively consolidating the Debtors' estates and the Chapter 11 Cases as set forth in the Plan and in the above-described motion. Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the estates of the Debtors for the purposes of confirming and consummating the Plan, including, without limitation, voting, confirmation, and distributions.

On and after the Effective Date: (a) all assets and liabilities of the Debtors shall be treated as though they were pooled; (b) each claim filed or to be filed against any of the Debtors, as to which two or more of the Debtors are co-liable as a legal or contractual matter, shall be deemed filed as a single claim against, and a single obligation of, the Debtors; (c) all claims held by one of the Debtors against one or more of the other Debtors shall be cancelled or extinguished; (d) no distributions shall be made under the Plan on account of any claim held by one of the Debtors against one or more of the other Debtors; (e) all guarantees of any of the Debtors of the obligations

of one or more of the other Debtors shall be eliminated so that any claim against any of the Debtors and any claim based upon a guarantee thereof executed by one or more of the other Debtors shall be treated as one claim against the substantively-consolidated Debtors; and (f) any joint and several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any claims based upon such joint or several liability shall be treated as one claim against the substantively-consolidated Debtors.

The substantive consolidation of the Debtors under the Plan shall not, other than for purposes related to funding the distributions under the Plan, affect: (a) the legal and organizational structure of the Debtors; (b) the executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected; (c) any agreements entered into by the Liquidating Trust on or after the Effective Date; (d) the Debtors' or the Liquidating Trust's ability to subordinate or otherwise challenge claims on an entity-by-entity basis; (e) any Causes of Action or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the estates of the Debtors; and (f) distributions to the Debtors or the Liquidating Trust from any insurance policies or proceeds thereof. Notwithstanding the substantive consolidation called for in the Plan, each of the Debtors shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until each particular case is closed, dismissed, or converted.

**B.      Liquidating Trust and Liquidating Trustee.**

On the Effective Date, the Debtors and the Liquidating Trustee shall enter into the Liquidating Trust Agreement. Additionally, on the Effective Date, the Debtors shall irrevocably transfer to the Liquidating Trust all right, title, and interest in and to the Liquidating Trust Assets in accordance with the Plan, including, without limitation, Article 8.5 of the Plan. In its capacity as Liquidating Trustee, the Liquidating Trustee shall accept all Liquidating Trust Assets on behalf of the beneficiaries of the Liquidating Trust, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in its possession. The Liquidating Trust shall be deemed created and effective without any further action by the Court or any person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (a) collecting and liquidating the Liquidating Trust Assets; (b) prosecuting and resolving the Causes of Action; (c) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries of the Liquidating Trust; and (d) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

The CRO shall be appointed the Liquidating Trustee and such appointment shall be approved by the Court pursuant to the Confirmation Order. Following appointment, the Liquidating Trustee shall act in accordance with the Plan and Liquidating Trust Agreement, and, in such capacity, shall have the same powers as the board of directors and officers of the Debtors, and all bylaws, articles, and related corporate documents shall be deemed amended by the Plan to permit and authorize the same. The Liquidating Trustee's primary tasks are to receive the Liquidating Trust, liquidate assets, pursue Causes of Action, administer claims, and distribute

proceeds for the benefit of the holders of Allowed claims.  The Liquidating Trustee shall file a motion, application, or other request to close the Chapter 11 Cases when the cases have been fully administered.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) as well as the representative of the bankruptcy estates of the Debtors appointed pursuant to Section 1123(b)(3) of the Bankruptcy Code regarding all Liquidating Trust Assets.  The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include, without limitation, the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets, including through the creation of reserves as provided for under the Plan; (b) file tax returns or other reports required by governmental entities and pay taxes or other obligations incurred by the Debtors, the bankruptcy estates, and the Liquidating Trust to the extent payable consistent with the Plan, the Bankruptcy Code, or order of the Court; (c) retain and compensate, without further order of the Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution, and distribution of Liquidating Trust Assets; (d) calculate and implement distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust and, as set forth in Articles 5.2.5 and 8.5 of the Plan, those Causes of Action may be settled or compromised without notice and a hearing and without Court approval, but shall be subject to the consent of the Liquidating Trust Advisory Committee; (f) address and resolve issues involving objections, reconciliation, and allowance of claims and equity interests in accordance with the Plan; (g) undertake all administrative functions of the Plan and the Chapter 11 Cases, including the payment of all secured claims, Administrative Expense Claims, Priority Tax Claims, other priority claims, and fees payable to the U.S. Trustee, and the ultimate closing of the Chapter 11 Cases; (h) effect all actions and execute all agreements, instruments, and other documents necessary to implement the provisions of the Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer any asset on behalf of the Debtors and the Liquidating Trust; (i) defend, protect, and enforce any and all rights and interests transferred to the Liquidating Trust or Liquidating Trustee; (j) open, create, or close accounts to deposit, hold, and disburse funds; (k) invest cash in demand or time deposits to obtain market rates of return pending distributions; (l) file any and all reports and motions or requests for relief with the Court and any opposition thereto; (m) dissolve the Debtors or otherwise wind up the Debtors' corporate affairs and existence; (n) subject to approval of the Liquidating Trust Advisory Committee, incur indebtedness to fund administration of the Plan; and (o) perform any other functions that are necessary to effectuate the Plan and perform its duties as Liquidating Trustee.  The Liquidating Trust is the successor to the Debtors and their estates.

On the Effective Date, the Liquidating Trustee shall: (a) take possession of all books, records, and files of the Debtors and their respective estates; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of the same is no longer necessary or required.

The Liquidating Trustee may, but shall not be required to, invest cash (including any earnings thereon or proceeds therefrom) as permitted by Section 345 of the Bankruptcy Code or in other prudent investments, provided, however, that such investments are permitted to be made by a liquidating trust within the meaning of 26 C.F.R. § 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to 26 C.F.R. § 1.67-4(a) and in accordance with the Plan. The Liquidating Trust also shall annually (for tax years in which distributions from the Liquidating Trust are made) send to each known beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction, or credit and all such holders shall report such items on their federal income tax returns; provided, however, that no such statement need be sent to any class that is not expected to receive any distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction, or credit shall be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trustee shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental unit for taxing purposes. The Liquidating Trustee may request an expedited determination of taxes of the Debtors or of the Liquidating Trust under Section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust. The Liquidating Trustee shall be responsible for filing all tax returns for the Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtors, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses, and obligations incurred by the Liquidating Trustee in administering the Plan, the Liquidating Trust, or in any manner connected, incidental, or related thereto, in effecting distributions from the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such costs, expenses, and obligations shall include secured claims, Administrative Expense Claims, Tax Priority Claims, and other priority claims not otherwise satisfied as of the Effective Date. Such costs, expenses, and obligations shall be paid in accordance with the Liquidating Trust Agreement.

The Liquidating Trustee shall be entitled to be paid reasonable compensation and expenses from the Liquidating Trust, subject to the consent of the Liquidating Trust Advisory Committee. The Liquidating Trustee shall be entitled to retain professionals without Court approval, but with consent of the Liquidating Trust Advisory Committee, to assist in its duties, and shall be entitled to pay such professionals reasonable compensation and expenses, subject to the consent of the Liquidating Trust Advisory Committee. For the avoidance of doubt, the Liquidating Trustee may retain the former professionals of the Debtor and the Committee. The Liquidating Trustee may

hire former employees and other "insiders" (as that term is defined in the Bankruptcy Code) of the Debtors for postconfirmation services, and may pay such individuals reasonable compensation and expenses, subject to the consent of the Liquidating Trust Advisory Committee.

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under 26 C.F.R. Section 301.7701-4 and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' estates of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners of the Liquidating Trust.

The holders of Allowed Class 1 and Class 2 claims shall be the beneficiaries of the Liquidating Trust. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

### C.   Liquidating Trust Advisory Committee.

The Liquidating Trust Advisory Committee shall be a three-member committee established under the Liquidating Trust Agreement and the members of the Liquidating Trust Advisory Committee shall initially be the members of the Committee. The Liquidating Trust Advisory Committee may act with as few as two members. In the event that a resignation or termination of members of the Liquidating Trust Advisory Committee reduces the number of members to less than two members, then the remaining member and the Liquidating Trustee shall appoint one successor member, who shall be a holder of one or more Allowed general unsecured claims against one or more of the Debtors, in the Liquidating Trustee's sole discretion. As described more fully in the Liquidating Trust Agreement, the Liquidating Trust Advisory Committee shall monitor the Liquidating Trustee and all activities set forth in this Plan. The Liquidating Trust Advisory Committee shall have the power and authority to ratify or reject decisions of the Liquidating Trustee, and, in its discretion, the Liquidating Trust Advisory Committee may delegate to the Liquidating Trustee such power and authority as it deems proper. The members of the Liquidating Trust Advisory Committee shall not be paid for serving on the Liquidating Trust Advisory Committee except for reimbursement of actual expenses incurred by such members. The Liquidating Trust Advisory Committee shall be governed by the Liquidating Trust Agreement substantially in the form of those attached as Exhibit A of the Plan. In the event that a vote by the Liquidating Trust Advisory Committee results in a tie vote, the Liquidating Trustee (although not a member) shall be entitled to vote on that issue as set forth in Exhibit A of the Plan.

### D.   Indemnification of Liquidating Trustee and Liquidating Trustee Advisory Committee.

The Liquidating Trust shall indemnify the Liquidating Trustee and its employees, officer, directors, agents, representatives, and professionals for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including, without limitation, the reasonable fees and expenses of their respective professionals)

26

incurred without gross negligence, willful misconduct, or fraud on the part of the Liquidating Trustee and its employees, officers, directors, agents, representatives, and professionals (which gross negligence, willful misconduct, or fraud, if any, must be determined by Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Liquidating Trustee and its employees, officers, directors, agents, representatives, and professionals in connection with the acceptance, administration, exercise, or performance of their duties under the Plan or the Liquidating Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will conclusively be deemed not to constitute gross negligence, willful misconduct, or fraud. In addition, the Liquidating Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Liquidating Trustee and its employees, officers, directors, agents, representatives, and professionals from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, without limitation, to professional fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust or the implementation or administration of the Plan if the Liquidating Trustee and its employees, officers, directors, agents, representatives, and professionals acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Liquidating Trust. To the extent that the Liquidating Trust indemnifies and holds harmless any such person or entity as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the Liquidating Trust. The costs and expenses incurred in enforcing the right of indemnification in this Article shall be paid by the Liquidating Trust. This provision shall survive the termination of the Liquidating Trust Agreement and the resignation, replacement, or removal of the Liquidating Trustee and the Liquidating Trust Advisory Committee.

**E.      Term of Liquidating Trust.**

The Liquidating Trustee and Liquidating Trust Advisory Committee shall be discharged, and the Liquidating Trust shall be terminated, at such time as: (a) all Contested Claims have been resolved; (b) all of the Liquidating Trust Assets have been liquidated or abandoned; (c) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled; (d) all distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made; and (e) the Chapter 11 Cases have been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that an extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets and/or distributions in accordance with the Plan.

**F.      Dissolution of Committee.**

Upon the Effective Date, the Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to, and arising from, the Chapter 11 Cases. The retention and employment of the professionals retained by the Committee shall terminate as of the Effective Date, provided, however, that the Committee

shall exist, and its professionals shall be retained, after such date with respect to applications filed pursuant to Sections 330 and 331 of the Bankruptcy Code and motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

## VI.    PROOFS OF CLAIM AND ADMINISTRATIVE CLAIMS.

The deadline to file proofs of claim in this case was September 16, 2024 for non-governmental creditors and January 6, 2025, for governmental creditors.  The procedures for distribution on claims and for objections to claims are set out in Article VI of the Plan, as described above.  The Court's order approving the Plan will set the deadline for filing administrative expense claims.

## VII.    FEDERAL TAX CONSEQUENCES OF THE PLAN.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors and to holders of general unsecured claims. This summary does not address the federal income tax consequences to holders of Allowed Administrative Expense Claims, priority claims, or secured claims, if any.  This summary does not address foreign, state, or local income tax consequences, or any estate or gift tax consequences of the Plan, or the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER.  THIS SUMMARY DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED IN THE DISCLOSURE STATEMENT, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.**

### A.    Federal Income Tax Consequences to the Debtors.

The Debtors anticipate that confirmation of the Plan will have no federal income tax consequences on a cash basis for the Debtors.

Section 61(a)(12) of title 26 of the United States Code (the "IRC") provides generally that income from the discharge of indebtedness is includable as an item of gross income.  Section 108(a)(1)(A) of the IRC provides an exception to section 61(a)(12) of the IRC by excluding from gross income any amount which, but for application of section 108(a)(l)(A) of the IRC, would be includable in gross income by reason of the discharge of indebtedness of a taxpayer if the discharge

occurs in a title 11 case. However, if amounts are excluded from gross income under section 108(a)(l)(A) of the IRC, various tax attributes of the taxpayer must be reduced.

Upon information and belief, the Debtors have been treated for federal tax purposes as either partnerships or disregarded entities. This means that the owner(s) of the Debtors are treated as receiving any income or loss of the Debtors. This also means that income or loss from the Liquidating Trust will ultimately be allocated to the owner(s) of the Debtors since the Debtors are beneficiaries of the Liquidating Trust which is treated as a grantor trust. In the case of a partnership, section 108(a)(1)(A) of the IRC is applied at the owner, i.e. partner, level and not the partnership level as provided in section 108(d)(6) of the IRC. For purposes of applying section 108(a)(1)(A) of the IRC, a disregarded entity is not considered to be the "taxpayer" as that term is used in section 108(a)(1) of the IRC. Instead, the owner of the disregarded entity is treated as the "taxpayer" pursuant to the provisions of Treas. Reg. section 1.108-9.

Since the Debtors are either partnerships or disregarded entities, the owners of the Debtors, not the Debtors, will be responsible for any income that will be derived from discharge of indebtedness occasioned by the Plan and the application of section 108(a)(1)(A) of the IRC.

**B.      Federal Income Tax Consequences to Holders of General Unsecured Claims.**

In accordance with the Plan, holders of Allowed general unsecured claims will receive a distribution on such claims. Any holder of an Allowed general unsecured claim will realize a loss in an amount equal to such claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of Allowed general unsecured claims will differ and will depend on factors specific to such holder, including but not limited to: (a) whether the claim, or a portion thereof, constitutes a claim for interest or principal; (b) the origin of the claim; (c) the type of consideration received in exchange for the claim; (d) whether the holder is a United States person or a foreign person for tax purposes; (e) whether the holder reports income on the accrual or cash basis method; and (f) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the claim.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF A GENERAL UNSECURED CLAIM AS A RESULT OF THE PLAN**

**C.      Withholding and Reporting.**

Payments of interest, dividends, and certain other payments are generally subject to backup withholding at the rate of 24% unless the payee furnishes his, her, or its correct taxpayer identification number to the payor. The Debtors or Liquidating Trustee may be required to withhold the applicable percentage of any payments made to a holder who does not provide its

taxpayer identification number.  Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax.

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CIRCUMSTANCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.**

## VIII.   ALTERNATIVES TO THE PLAN.

### A.      Chapter 7 Liquidation.

If a plan pursuant to Chapter 11 of the Bankruptcy Code is not confirmed by a bankruptcy court, a debtor's Chapter 11 case may be converted to a liquidation case under Chapter 7 of the Bankruptcy Code.  In a liquidation case under Chapter 7 of the Bankruptcy Code, a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the conversion of the Chapter 11 Cases to cases under Chapter 7 would result in smaller distributions being made to the Debtors' creditors than those provided for in the Plan because: (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion; and (b) additional administrative expenses attendant to the appointment of a trustee, the trustee's employment of attorneys and other professionals, and the time required for a trustee and the trustee's professionals to become acclimated with the Debtors' financial position and the status of the claims filed in this case.  The Debtors believe that confirmation of the Plan will provide each holder of an Allowed claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

### B.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtors' assets.  However, the Debtors believe that the terms of the Plan provide for an orderly and efficient liquidation of the Debtors' assets and will result in the realization of the most value for holders of claims against the Debtors' estates.

### C.      Dismissal of the Chapter 11 Cases.

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the position they were in immediately prior to the Petition Date.  Upon the

dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtors and possibly resulting in costly and protracted litigation in various jurisdictions. Dismissal would also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a preferable alternative to the Plan.

## IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN.

### A.    General Confirmation Requirements.

Section 1129(a) of the Bankruptcy Code contains several requirements for confirmation of a plan. Among these requirements are that a plan be proposed in good faith, that certain information be disclosed regarding payments made or promised to be made to insiders, and that the plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. The Debtors believe that they have complied with these requirements, including those requirements discussed below.

### B.    Best Interests Test.

The "best interests of creditors" test requires that the Court find either that all members of each impaired class have accepted the plan or that each holder of an Allowed claim or interest of each impaired class of claims or interest will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of claims would receive if the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Court must first determine the dollar amount that would be realized from the liquidation (the "Chapter 7 Liquidation Fund") of the Debtors. The Chapter 7 Liquidation Fund would consist of the net proceeds from the disposition of the Debtors' assets (after satisfaction of all valid liens) augmented by the cash held by the Debtors and recoveries on actions against third parties. The Chapter 7 Liquidation Fund would then be reduced by the costs of the liquidation. The costs of the liquidation under Chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, and unpaid expenses incurred by the Debtors during its Chapter 11 case (such as fees for attorneys, financial advisors, and accountants) which would be allowed in Chapter 7 proceedings, interest expense on secured debt, and claims incurred by the Debtors during the pendency of the case. These claims would be paid in full out of the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund, if any, that would be made available to holders of unsecured claims. In addition, other claims may arise upon conversion to a Chapter 7 case that would dilute the balance of the Chapter 7 Liquidation Fund available to holders of claims. Moreover, additional claims against the Debtors' estates might arise as a result of the establishment of a new bar date for the filing of claims in the hypothetical Chapter 7 cases. The present value of the distributions out of the Chapter 7 Liquidation Fund (after deduction the amounts described above) are then compared with the present value of the property

31

offered to each of the classes of claims and holders of interests under the Plan to determine if the Plan is in the best interests of each holder of a claim.

The Debtors believe that the Plan as proposed is in the best interests of all creditors. As set forth in the liquidation analysis attached as **Exhibit 1**, if the Debtors were forced to liquidate their assets in Chapter 7, unsecured creditors would receive between 17.9% and 27.4% of their claims. The Debtors believe the distribution to holders of Allowed general unsecured claims under the Plan will exceed the percentage unsecured creditors would receive in the Chapter 7 cases. Additionally, the Debtors believe that the distribution to holders of Allowed general unsecured claims under the Plan will occur sooner than any distribution in a Chapter 7 case.

### C.    Financial Feasibility Test.

In addition to the requirements discussed above, Section 1129(a)(11) of the Bankruptcy Code requires that consummation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors. In this case, the Plan provides for an efficient liquidation of the Debtors' remaining assets and distributes the proceeds so as to provide the greatest possible recovery to the Debtors' creditors. Accordingly, the Court's confirmation of the Plan is not likely to be followed by an additional liquidation or the need for any further reorganization.

### D.    Cramdown Alternative.

In the event that a certain class or classes of claims reject the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. A bankruptcy court may confirm a plan at the request of the plan proponent if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to any classes of claims.

In addition, a plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Debtors believe that the Plan will meet the "fair and equitable" requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of claims in all classes. The Debtors understand, however, that the Plan may not be confirmable with respect to such classes if any such class does not vote in favor of the Plan

## X.    RISK FACTORS TO BE CONSIDERED.

The holders of claims against the Debtors should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Bankruptcy Considerations.

Although the Debtors believe the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in Article VIII of the Plan. If the conditions have not been satisfied or waived (to the extent possible) by the Debtors or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no distributions will be made pursuant to the Plan, and the Debtors and all holders of claims and interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of claims and interests encompass claims or interests, as applicable, that are substantially similar to the other claims and interests in each such class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Finally, the Plan provides that certain classes are to receive a pro rata share of the Liquidating Trust, which will be generated, in part, by the liquidation of certain assets. The potential recoveries from such assets, however, are unknown.

### B.    No Duty to Update Disclosures.

The Debtors have no duty to update the information contained in this Disclosure Statement as of the date of this Disclosure Statement, unless otherwise specified in the Plan or Disclosure Statement, or unless the Debtors are required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date of this Disclosure Statement does not imply that the information contained in the Disclosure Statement has remained unchanged.

### C.     Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtors and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court.  Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by holders of claims or interests that are entitled to vote to accept or reject the Plan.

### D.     No Admission.

The information and representations contained in the Plan or Disclosure Statement shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtors or holders of claims and interests.

### E.  Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in Section VII of the Disclosure Statement; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business, or other professional advice.  Holders of claims and interests should seek advice from their own independent tax, legal, or other professional advisors based on their own individual circumstances.

## XI.    RECOMMENDATION AND CONCLUSION.

The current liquidating structure has facilitated settlements – or pending settlements – of a number of different claims against the Project Companies.  Additionally, the Debtors commenced a number of adversary proceedings against other Project Companies.  The Liquidating Trust will be in the best position to proceed with those adversary proceedings to maximize the recovery to the Debtors' creditors.  The Debtors believe that continuing with this liquidation structure under the Plan offers the best alternative for the highest and fastest recovery for holders of Allowed claims.  Thus, the Debtors believe the Plan is in the best interests of the Debtors' estates, creditors, and other interested parties and urges the holders of claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

**[SIGNATURE PAGE TO FOLLOW]**

## SIGNATURE PAGE FOR DISCLOSURE STATEMENT

**EPIC COMPANIES MIDWEST, LLC**

By: _PATRICK FINN_
Name: Patrick Finn
Title: Partner at Lighthouse Management Group, Inc.,
CRO of EPIC Companies Midwest, LLC

**EPIC COMPANIES MIDWEST 2023, LLC**

By: _PATRICK FINN_
Name: Patrick Finn
Title: Partner at Lighthouse Management Group, Inc.,
CRO of EPIC Companies Midwest 2023, LLC

**EPIC EMPLOYEE, LLC**

By: _PATRICK FINN_
Name: Patrick Finn
Title: Partner at Lighthouse Management Group, Inc.,
CRO of EPIC Employee, LLC

**EOLA CAPITAL, LLC**

By: _PATRICK FINN_
Name: Patrick Finn
Title: Partner at Lighthouse Management Group, Inc.,
CRO of EOLA Capital, LLC

**EC WEST FARGO, LLC**

By: _PATRICK FINN_
Name: Patrick Finn
Title: Partner at Lighthouse Management Group, Inc.,
CRO of EC West Fargo, LLC

/e/ *Steven R. Kinsella*
Michael S. Raum (#05676)
**FREDRIKSON & BYRON, P.A.**
51 Broadway, Suite 400
Fargo, ND  58102-4991
701.237.8200
mraum@fredlaw.com

Steven R. Kinsella (#09514)
Katherine A. Nixon (*pro hac vice* MN #0402772)
**FREDRIKSON & BYRON, P.A.**
60 South 6th Street, Suite 1500
Minneapolis, MN  55402-4400
612.492.7000
skinsella@fredlaw.com
knixon@fredlaw.com

**ATTORNEYS FOR DEBTORS**

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS'
CHAPTER 11 PLAN OF LIQUIDATION
EXHIBIT 1 – LIQUIDATION ANALYSIS**

Prepared On: 5/5/2025

**EPIC Funds (E23, ECF, ECM, EMP, EOL)**
**BKY Case Nos. 24-30281, 24-30282, 24-30283, 24-30284, 24-30285**
**Hypothetical Chapter 7 Liquidation Analysis**
**Conversion as of August 1, 2025**

| | Chapter 11 Liquidation | | Chapter 7 Liquidation | | |
|---|---|---|---|---|---|
| | Low Range | High Range | Low Range | High Range | |
| **ASSETS** | | | | | |
| Cash as of 08/1/25 | 708,301 | 708,301 | 708,301 | 708,301 | (1) |
| Notes Receivable Collections | 7,710,432 | 11,565,648 | 7,710,432 | 11,565,648 | (2) |
| Other Causes of Action | TBD | TBD | TBD | TBD | (3) |
| **Total Proceeds Available** | **$8,418,733** | **$12,273,949** | **$8,418,733** | **$12,273,949** | |
| | | | | | |
| **ADMINISTRATIVE EXPENSES/CLAIMS** | | | | | |
| Liquidating Trustee /Chapter 7 Trustee Fees | 275,000 | 275,000 | 275,812 | 391,468 | (4) |
| Administrative Expenses | 170,600 | 170,600 | 170,600 | 170,600 | (5) |
| Legal Fees & Expenses | 536,000 | 536,000 | 554,750 | 554,750 | (6) |
| Financial Advisors | - | - | 200,000 | 200,000 | (7) |
| Other Experts | 50,000 | 50,000 | 250,000 | 250,000 | (8) |
| **Total Administrative Expenses** | **$1,031,600** | **$1,031,600** | **$1,451,162** | **$1,566,818** | |
| | | | | | |
| **NET AVAILABLE FOR DISTRIBUTION TO UNSECURED CREDITORS** | **$7,387,133** | **$11,242,349** | **$6,967,571** | **$10,707,131** | |
| | | | | | |
| | | | | | |
| **Estimate of Unsecured Claims** | **$39,008,304** | **$39,008,304** | **$39,008,304** | **$39,008,304** | (9) |
| Recovery % | 18.9% | 28.8% | 17.9% | 27.4% | |

**Notes:**
(1) Estimated cash balance on August 1, 2025.
(2) Estimated recovery of Note Receivable principal and accured interest.
(3) Recovery from Other Cause of Action to be determined. Cost of pursuing Other Causes of Action not included in analysis.
(4) Estimated fees paid to Chapter 7 Trustee

| | | |
|---|---|---|
| Total Proceeds Collected | $ 8,418,733 | $12,273,949 |
| 25% of first $5,000 | 1,250 | 1,250 |
| 10% of amount between $5,000 and $50,000 | 4,500 | 4,500 |
| 5% of amount between $50,000 and $1,000,000 | 47,500 | 47,500 |
| 3% of amount in excess of $1,000,000 | 222,562 | 338,218 |
| Total | $ 275,812 | $ 391,468 |

(5) Administrative expenses incurred by Liquidating Trustee or Chapter 7 Trustee estimated to be approximately the same.
(6) Estimate that Chapter 7 Trustee would incur increased legal fees reviewing records and assessing claims.
(7) Estimate that Chapter 7 Trustee would engage a Financial Advisor to provide finanical analysis and litigation support.
(8) Estimate cost of Experts required to support litigation.
(9) Estimate of Unsecured Claims is prior to claim objections.